**SECOND DIVISION**
**MILLER, P. J.,**
**BROWN and GOSS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 24, 2019**

# In the Court of Appeals of Georgia

A18A1986. THE STATE v. RICH.

MILLER, Presiding Judge.

After a Cherokee County grand jury indicted Laura Rich on three counts of sexual assault of a student under OCGA § 16-6-5.1 (b) (1), Rich moved to dismiss or quash the indictment, contending that she was not a "teacher" for purposes of the statute. The trial court granted Rich's motion, finding that even if OCGA § 16-6-5.1 (b) (1) applied to Rich, it did not apply to her conduct beyond school hours. The State appeals from the trial court's order granting Rich's motion to dismiss or quash the indictment. We affirm the trial court's decision to grant the motion because in

accordance with the relevant principles of statutory construction, Rich was not a "teacher" for purposes of OCGA § 16-6-5.1 (b) (1).[1]

"[T]he interpretation of a statute is a question of law, which is reviewed de novo on appeal. Because the trial court's ruling on a legal question is not due any deference, we apply the 'plain legal error' standard of review." (Citation omitted.) *State v. Hammonds*, 325 Ga. App. 815 (755 SE2d 214) (2014). "We also bear in mind that the application of a statute's standards sometimes requires an assessment of the surrounding circumstances to determine if the statute is violated." (Citation and punctuation omitted). *Smith v. State*, 311 Ga. App. 757, 758 (717 SE2d 280) (2011).

So viewed, the record shows that in 2017, a Cherokee County grand jury indicted Rich on three counts of sexual assault of a student, in violation of OCGA § 16-6-5.1 (b) (1). The indictment alleged that Rich, "being a teacher" "with supervisory and disciplinary authority" over two persons, engaged in sexual contact

---

[1] The trial court determined that if the statute applied to Rich, it did not apply to her conduct after school hours. We, however, affirm the trial court's order on the basis that Rich did not fall within the ambit of the statute at all. See *State v. Lane*, 275 Ga. App. 781, 783 (621 SE2d 862) (2005) ("[W]e will affirm an order under the 'right for any reason rule,' . . . when the judgment may be sustained upon a legal basis apparent from the record which was fairly presented in the court below.") (citation omitted); *Vonslep v. State*, 253 Ga. App. 881, 883 (2) (560 SE2d 752) (2002).

with them in 2015, and that she knew or should have known that they were students enrolled at the school where she was employed.

After Rich was arraigned, she filed a motion to dismiss or quash the indictment. Rich argued that (1) she was not a "teacher" within the meaning of the statute because she was a substitute without a teaching certificate; and (2) her supervisory and disciplinary authority over the students ceased at the end of each school day that she worked as a daily substitute, and the alleged sex acts did not occur during school hours.[2]

At a hearing on the motion, the trial court heard testimony from the principal of the public school at issue, as well as one of the Human Resources Directors for the Cherokee County School District where the school is located. Public school teachers in the Cherokee County School District have either a teaching certificate or permit from the Georgia Professional Standards Commission ("PSC"), which is the licensing

---

[2] Rich also challenged the constitutionality of the statute, but the trial court did not reach this argument because it concluded that the statute did not apply to Rich's conduct. Thus, this issue is not before the Court, and we do not address it. *City of Decatur v. DeKalb County*, 284 Ga. 434, 438 (2) (668 SE2d 247) (2008). We also note that Rich's counsel represented to the trial court that the students were above the age of 16.

body for education in the State of Georgia.[3] Generally, a teacher becomes certified by attending a teaching education program approved by the PSC. Student teachers "go[] through a pre-approved program with the State of Georgia" and hold a "pre-service certificate."

Substitutes, on the other hand, need not be certified by the PSC. And, unlike public school teachers in the Cherokee County School District, substitutes do not work under contracts with schools. Instead, substitutes receive a daily per diem for their work, and do not qualify for health benefits, unemployment benefits, or leave. According to the testimony, the PSC defines a substitute as either "an individual employed to serve in the absence of the regularly employed teacher" or "a person temporarily employed to teach a class that does not have a regular teacher."

In order to be a part of the "pool" of substitutes for the Cherokee County School District, prospective substitutes complete an on-line application, undergo a background check, and then participate in a three-and-a-half to four-hour workshop on "cursory items that they may or may not face in the classroom." Although

---

[3] For example, "someone who teaches a career technical course such as welding . . . might not have a traditional teaching certificate" but may have a permit from the PSC.

4

substitutes must abide by the Code of Ethics for Educators, paraprofessionals and aides also adhere to this Code.

A substitute may work on either a "long-term" or "daily" basis. Rich was a daily substitute at the school, holds a high school diploma, and is not certified by the PSC. Because Rich did not possess a teaching certificate, she was a "classified employee," like cafeteria workers and maintenance staff. A daily substitute works on a temporary, as-needed basis, and fills in for a teacher who will be absent for either a single day or a few days. A daily substitute is not expected to prepare for class, prepare any homework assignments, administer any state-mandated tests, grade or evaluate students' work, answer students' questions after class, or participate in after-school programs. Although daily substitutes have an ongoing duty of confidentiality pertaining to the students, their responsibilities to the students cease at the end of the school day and do not extend beyond "that eight-hour threshold." Upon the end of the school day, the daily substitute returns to the "pool" of available substitutes.

In order to begin working, a daily substitute can select an available job from an online system, or call the principal's secretary and ask whether the school has an available job. Alternatively, he or she can await an "early morning call" informing of an opening. Once in the classroom, the substitute ensures that the students have been

provided with their individual lesson plans or "study guide packets." The students would either already have their packets in their possession, or would already know the work that they have been assigned by their regular teacher. As the students work on their packets, the substitute "might be able to assist" in completing them. If a student has questions while working, the substitute would answer these questions if he or she is capable of doing so, depending on the substitute's understanding of the material. Essentially, daily substitutes assist "[w]hen they could and where they could." When a student has completed his or her packet, the substitute "may take it, but then hold it for the return of the regular teacher." In the event that the regular teacher has not left instructions for the class, the substitute either looks for an emergency lesson plan or "go[es] to the other teachers in that particular subject to figure out what to do."

When a teacher is absent for more than 10 consecutive days, and a long-term substitute is needed, preference for filling the slot is given to substitutes who are certified with the PSC. Like teachers, these long-term substitutes are "expected to assume responsibilities for lesson planning and evaluating and grading the students' work."

Following the hearing, the trial court granted Rich's motion, finding that as a daily substitute Rich bore no obligation to the school district when she left school after substituting. The trial court therefore concluded that if OCGA § 16-6-5.1 (b) (1) applied to Rich, it did so only while she performed her duties during the school day. Because there was no allegation that the sex acts occurred during school hours or at the school, the trial court found that the statute was inapplicable to Rich's conduct. The State now appeals.

In its sole enumeration of error, the State contends that the trial court erred in granting Rich's motion to dismiss or quash the indictment because Rich qualified as a "teacher" under OCGA § 16-6-5.1 (b) (1). The State posits that Rich frequently accepted "teaching assignments" at the school, was heavily relied upon by the school, had worked frequently during the relevant times identified in the indictment, and essentially became a familiar figure in the school community "as a teacher." We discern no reversible error.

OCGA § 16-6-5.1 (b) (1)[4] provides,

_____

[4] The language of OCGA § 16-6-5.1 (b) (1) has remained the same since before all the alleged acts in this case occurred. See Ga. L. 2011, p. 227, § 5; Ga. L. 2015, p. 422, § 5-20; Ga. L. 2016, p. 864, § 16.

7

A person who has supervisory or disciplinary authority over another individual commits sexual assault when that person: (1) Is a teacher, principal, assistant principal, or other administrator of any school and engages in sexual contact with such other individual who the actor knew or should have known is enrolled at the same school . . . .

In analyzing the State's claim that Rich was indeed a "teacher" for purposes of the statute, we are mindful of the applicable principles of statutory construction and "look diligently for the intention of the General Assembly. In so doing, the ordinary signification shall be applied to all words. Where the language of a statute is plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly." (Citation omitted.) *Hammonds*, supra, 325 Ga. App. at 817. "Criminal statutes are construed strictly against the State, they must be read according to the natural and obvious import of their language, and their operation should not be limited or extended by application of subtle and forced interpretations." (Citation omitted.) *Perkins v. State*, 277 Ga. 323, 325-326 (2) (588 SE2d 719) (2003). Also, if a criminal statute "is susceptible to more than one reasonable interpretation, the interpretation most favorable to the party facing criminal liability must be adopted." *Smith*, supra, 311 Ga. App. at 761 (2) (b).

At the outset, we note that OCGA § 16-6-5.1 does not define the term "teacher," and precedent from the Supreme Court of Georgia has left open the question of whether the statute applies to a substitute who lacks a teaching certificate. *State v. Morrow*, 300 Ga. 403, 406 (2), n.8 (794 SE2d 37) (2016). Under our Education Code, "teacher" means "any professional school employee certificated by the Professional Standards Commission, but not including school administrators." OCGA § 20-2-942 (a) (4). See also *Morrow*, supra, 300 Ga. at 406 (2). And it is undisputed that Rich did not hold a teaching certificate or permit from the PSC, as is generally required of public school teachers in the Cherokee County School District.

In the absence of a statutory definition of the term "teacher," we turn to the dictionary definition. Webster's Dictionary defines a teacher as "one that teaches or instructs," especially "one whose occupation is to instruct." Webster's Third New International Dictionary at 2346 (1981). Although a substitute may in fact be hired to teach a class, in this case Rich was not tasked with teaching classes, instructing[5]

[5] We do not interpret the word "instruct" so broadly as to mean that Rich provided "instructions" to the students. Conceivably, a myriad of employees at the school would have been able or expected to provide instructions to the students, and would not be deemed "teachers" for purposes of the statute. Indeed, according to the testimony, paraprofessionals and aides also provide instructions to students, and the Supreme Court has made clear that a paraprofessional is not a "teacher" for purposes of the statute. *Morrow*, supra, 300 Ga. at 406, n.7. See also *Hammonds*, supra, 325

classes, or developing lessons for the students. Rather, her duties comprised monitoring students, assisting them with completing their lesson plans or study guide packets as previously assigned by their regular teacher, and, answering their questions while they worked if her knowledge of the material enabled her to do so. As the principal testified, a daily substitute like Rich "is a facilitator assisting those students . . . as that period goes on." Also, as a daily substitute Rich had even fewer obligations than a long-term substitute, who has the "same job duties and responsibilities of a certified teacher." In fact, because Rich held only a high school diploma, she could not even qualify to be a long-term substitute under the regulations promulgated by the PSC. See Ga. Comp. R. & Regs. 505-2-.20 (2) (f).

The fact that Rich often worked at the school does not demand the conclusion that her duties and responsibilities were those of a "teacher." The crucial inquiry here is whether her job was equivalent to that of a "teacher," not the number of days she was present in school. To a great extent, Rich simply "did not do the sorts of things that teachers typically do." *Morrow*, supra, 300 Ga. at 406. She was not expected to prepare for class, administer any state-mandated tests, grade or evaluate students'

Ga. App. at 816, n.1 ("If [the defendant] was considered an administrator simply because she could initiate a disciplinary referral, then logically an argument can be made that the same would apply to janitors or food service workers.").

10

work, answer students' questions after class, or participate in after-school programs. Nor did she independently assign class work or homework.[6] See id. (no evidence that defendant assigned class work, homework, or any other tasks, taught lessons, graded work, administered tests, attended faculty meetings, reported to school on teacher workdays or "devote[d] any meaningful portion of his time to the instruction of students").

In this appeal, "the determinative factor is whether, when OCGA § [16-6-5.1 (b) (1)] is given the requisite strict construction, it is unreasonable to interpret" the term "teacher" such that it does not apply to Rich. *Vines v. State*, 269 Ga. 438, 439 (499 SE2d 630) (1998). Given that Rich did not hold a teaching certificate; was not on contract as a teacher; did not actually teach or instruct classes; and had considerably fewer obligations than the teacher for whom she substituted (and even a long-term substitute), it is reasonable to conclude that, when OCGA § 16-6-5.1 (b) (1) is strictly construed against the State, Rich was not in fact a "teacher" for purposes of the statute. "Thus, even if the State's broad construction were reasonable despite

_____

[6] According to the testimony, the classes in this specific school are "student-directed instead of teacher-directed" and the teacher does not customarily lecture throughout the entire class session. Notwithstanding this fact, daily substitutes generally did not engage in the range of tasks expected of teachers or long-term substitutes.

11

the lack of any supporting authority, the contrary strict construction of OCGA § [16-6-5.1 (b) (1)] nevertheless must be accepted because it is at least equally reasonable." Id. As our Supreme Court has made clear, where a criminal statute "is susceptible to more than one reasonable interpretation, the interpretation most favorable to the party facing criminal liability *must* be adopted." (Emphasis supplied.) Id. at 438-439. See *Frix v. State*, 298 Ga. App. 538, 542 (680 SE2d 582) (2009) ("[T]o the extent any uncertainty or ambiguity exists in the meaning of [the statute], the rule of strict construction would require us to construe that ambiguity in [the defendant's] favor.").

Finally, we observe that the Legislature uses both the terms "substitute teacher" and "substitutes for teachers" elsewhere in the Georgia Code,[7] and it opted not to include either of these two terms when delineating the persons who fall under OCGA § 16-6-5.1 (b) (1).[8] See *Morrow*, supra, 300 Ga. at 406 ("The degree of specificity in the statutory identification of school administrators to whom the statute applies

---

[7] See OCGA § 20-2-216.

[8] It appears that in March 2018, the Georgia House of Representatives passed Senate Bill No. 154 by substitute legislation, broadening the reach of OCGA § 16-6-5.1 (b) (1) to any "employee or agent" of the school and making the offense sexual assault in the second degree. See Senate Bill No. 154 (Substitute) (LC 29 8102ERS), 2017-2018 Regular Session of the General Assembly. However, the Legislature took no further action on this matter.

12

suggests that the statute does not use "teacher" in a generic or unusually broad sense."). To be sure, our decision is not a condonation of the acts alleged. Rather, we are mindful that we "must generally refrain from expanding the scope of penal statutes by implication." (Citation and punctuation omitted.) *Hammonds*, supra, 325 Ga. App. at 817. See *Rodriguez v. State*, 343 Ga. App. 526, 530 (806 SE2d 916) (2017) ("[U]nder the uniform rule of strict construction, a penal statute can not be expanded by implication to include conduct or persons not explicitly identified in the statute.") (citation and punctuation omitted).

In accordance with the relevant rules of statutory construction, we determine that Rich was not a "teacher" for purposes of OCGA § 16-6-5.1 (b) (1). Therefore, the trial court properly granted Rich's motion to quash or dismiss the indictment.

*Judgment affirmed. Brown and Goss, JJ., concur.*